# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-1765

_____

United States of America

*Plaintiff - Appellee*

v.

George Wylie Thompson

*Defendant - Appellant*

_____

No. 11-1813

_____

United States of America

*Plaintiff - Appellee*

v.

Ralph Francis Deleo

*Defendant - Appellant*

_____

No. 11-2124

_____

United States of America

*Plaintiff - Appellee*

v.

Samuel Gaylon Baggett

*Defendant - Appellant*

_____

No. 11-2604

_____

United States of America

*Plaintiff - Appellee*

v.

George Wylie Thompson

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: February 14, 2012
Filed: August 28, 2012

_____

Before LOKEN, BYE, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

George Thompson, Samuel Baggett, and Ralph DeLeo appeal their criminal convictions for offenses connected to illegal gambling, drug trafficking, firearms, and marriage fraud. On appeal, Thompson, Baggett, and DeLeo assert error from lack of suppression of wiretap evidence, error from improper joinder of Baggett's and Thompson's cases, erroneous refusal to exclude evidence of Thompson's criminal history and travel to China, and error from a determination that federal officers acted within the scope of a search warrant when searching DeLeo's apartment. DeLeo also argues that we should consider his ineffective assistance of counsel claim on direct appeal, and Thompson argues that his right to be free of double jeopardy was violated when the district court first granted, then reversed and denied, Thompson's motion for judgment of acquittal on one count. We deny these claims and affirm on each issue, with the exception of Thompson's double jeopardy claim. On that issue, we find a double jeopardy violation and reverse Thompson's conviction on the one count implicated by the double jeopardy issue.

## I. Facts

In December 2008, the government began to surveil George Thompson pursuant to an authorized wiretap. The government supported the wiretap application with a sixty-eight-page affidavit setting out evidence supporting probable cause that five or more people were participating in an illegal gambling business. This affidavit was based on evidence obtained through undercover observation from confidential witnesses ("CW"s), toll record analyses, surveillance photos, and trash pulls. The affidavit described meetings between George Allen Thompson (the son of appellant George Thompson), Gene Baker, and Dana Kuykendall, all alleged to be members of the illegal gambling business; surveillance of Baker's "runs" to exchange money and betting slips; and calls between Baker, Thompson, and other members of the business. The affidavit also explained why wiretaps were necessary: it noted concerns that CWs were passing information not only to law enforcement, but also back to members of

the business and the fact that George Thompson burned betting slips weekly instead of just throwing them away.

Through this wiretap, police overheard evidence about illegal drug trafficking across state lines and the sale of firearms from Samuel Baggett to convicted felon George Thompson. On the basis of the original affidavit, as well as information obtained through the wiretap, the district court reauthorized the wiretap twice, expanding its scope from calls relating to an illegal gambling enterprise, to those relating to possible firearms, narcotics, extortion, visa fraud, and immigration offenses.

After surveilling Thompson and his associates on the expanded wiretap for several months, police executed search warrants for Thompson's property in May and for Baggett's property in June. At the time they searched Baggett's property, police also questioned Baggett about his relationship with Thompson and whether Baggett had illegally sold him firearms and ammunition. Baggett denied having sold Thompson firearms and ammunition.

In November 2009, police stopped Tri Cam Le (who is not a party to this case) and found a significant amount of cocaine in his possession. After being arrested, Le called Thompson, who in turn called Ralph DeLeo to discuss the arrest. On the basis of this call and an ensuing investigation, the government executed a search warrant on DeLeo's apartment. In the course of executing that search warrant, police searched a storage room across the hall from the apartment, found a significant amount of cocaine, and arrested DeLeo. On the basis of the evidence described above, the government moved to indict and arrest Thompson, Baggett, and DeLeo. It jointly indicted Thompson and Baggett[1] and also jointly indicted Thompson and DeLeo for

---

[1]A third person, Cary Gaines, was also indicted along with Thompson and Baggett, but he is not a party to this appeal.

-4-

various gambling, drug, and firearms offenses. Two cases proceeded to trial: one against Thompson and Baggett and one against Thompson and DeLeo.

Before each trial, the defendants made several motions relevant to this appeal. In the trial of Baggett and Thompson, Thompson moved to suppress evidence obtained by the wiretap and also to sever the individual charges against him. Baggett moved to sever his trial from Thompson's. The district court denied each of these motions.

At the Baggett and Thompson trial, the government introduced several pieces of evidence relevant to Baggett's knowledge of Thompson's felony status to support its claim that Baggett aided and abetted a felon in possession of firearms: (1) a letter to a state trial judge stating that Baggett had known Thompson for twenty years and asking for the judge to show mercy to Thompson, (2) a telephone call between Baggett and Thompson discussing options for getting Thompson a gun without having to register, and (3) the fact that Thompson had told Baggett about time he served in jail. During this trial, Baggett filed a conditional motion to sever if Thompson chose not to testify. After it became apparent that Thompson would indeed not testify, the district court denied the motion to sever. At the close of the government's case, Thompson moved for a judgment of acquittal. The district court took this motion under advisement, then denied it on all counts except count five, felon in possession of a firearm. At this point, Thompson rested his case without putting on any evidence, and Baggett began to call witnesses. After several witnesses testified, the court, during a recess, expressed doubt as to the judgment of acquittal on count five, and asked the parties for case law on whether it could reverse itself. The following morning, the court determined it could reverse the motion, denied Thompson's motion for a judgment of acquittal on count five, and resumed the trial. After that trial, the jury found Thompson guilty of all counts, including count five. Thompson was thus convicted of two counts being a felon in possession of a firearm, one count of being a felon in possession of ammunition, one count of conspiracy, one

count of illegal silencers, two counts of conspiracy to conduct an illegal gambling ring, and one count of marriage fraud. Baggett was found guilty of one count each of aiding and abetting a felon in possession of a firearm, false statements, and conspiracy.

Before the trial of Thompson and DeLeo, both Thompson and DeLeo moved to suppress evidence obtained by the wiretap. Thompson also moved to suppress evidence concerning a prior arrest for drug trafficking activity and evidence of his travel to China immediately after federal agents searched several of his properties. DeLeo moved to suppress evidence found in a storage room that agents searched ostensibly under the authority of a search warrant of his apartment. The district court denied these motions.

At Thompson's and DeLeo's trial, the government introduced evidence of the telephone call between Thompson and DeLeo discussing Tri Cam Le's arrest. It also put on evidence of Thompson's withdrawal of money and travel to China following a search of Thompson's home and another property he owned. After the trial, a jury found Thompson guilty of (1) conspiracy to possess with intent to distribute cocaine, (2) aiding and abetting possession with intent to distribute cocaine, and (3) use of a communication device to facilitate a drug transaction. The jury found DeLeo guilty of (1) conspiracy to possess with intent to distribute cocaine, (2) use of a communication device to facilitate a drug transaction, and (3) aiding and abetting possession with intent to distribute cocaine.

## II. Discussion

### A. Suppression of Wiretap Evidence

The district courts did not err in refusing to suppress evidence police acquired from the wiretap.[2] "We review the denial of a motion to suppress de novo but review underlying factual determinations for clear error, giving due weight to the inferences of the district court and law enforcement officials." United States v. Nichols, 574 F.3d 633, 636 (8th Cir. 2009) (internal quotation marks omitted). Thompson and DeLeo assert three errors in both district courts' decisions to admit the wiretap evidence. We address each asserted error below.

### 1. Probable Cause

Among other things, the federal wiretap statute requires judges granting applications for wiretaps to find that "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter." 18 U.S.C. § 2518(3)(a). The probable cause requirement in this statute is linked to the Fourth Amendment. Thus, to grant an application for a wiretap, district courts must make a "practical, common-sense decision whether," considering the "totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

One of the enumerated offenses for which a judge may grant an application for a wiretap is found in 18 U.S.C. § 1955, which prohibits illegal gambling businesses

---

[2]Thompson challenges the district courts' denial of his motion to suppress in both cases against him. In the appeal from the joint trial of Thompson and DeLeo, DeLeo joins him in this challenge.

that "involve[] five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business." 18 U.S.C. § 1955(b)(1)(ii). This court has held that the language and legislative history of this section "was specifically drafted so as to exclude customers or bettors" from the count of five or more persons. United States v. Bennett, 563 F.2d 879, 881 (8th Cir. 1977). Instead, the section "applies generally to persons who participate in the ownership, management, or conduct of an illegal gambling business." Id. However, we have also clarified that "[t]he term 'conducts' refers both to high level bosses and street level employees." Id.

Thompson and DeLeo argue that the government's affidavit only established probable cause that four of the six people it identified were involved in the illegal gambling business. They therefore argue that the police did not have probable cause to believe that "five or more" persons were conducting an illegal gambling business, as required by the statute. They argue specifically that the police did not have probable cause to believe George Allen Thompson (Thompson's son) and Gene Baker were anything other than customers or bettors, rather than members of the illegal gambling enterprise. Thompson and DeLeo describe the evidence against Baker and George Allen Thompson as merely "generalized suspicions that failed to rise to the level of probable cause to believe they were members of the enterprise."

Thompson's description of the evidence supporting the affidavit is cursory and discounts the volume of gambling activity in which both George Allen Thompson and Baker were involved. This evidence, summarized in an affidavit to the district court supporting the government's wiretap application, includes multiple meetings between George Allen Thompson, Baker, and Dana Kuykendall (another member of the illegal gambling business); undercover agents' observations of the three men counting large amounts of money; surveillance of Baker making "runs" to exchange money and betting slips; hundreds of telephone calls between Baker, George Allen Thompson, and other members of the illegal gambling business; and conversations indicating that George Thompson was grooming George Allen to take over the gambling business.

-8-

The sheer volume of this evidence undercuts Thompson's argument that individual pieces of it are as consistent with Baker and George Allen Thompson being customers as with being members of the enterprise. See United States v. $141,770.00 in U.S. Currency, 157 F.3d 600, 604 (8th Cir. 1998) (holding that probable cause was established "[i]n light of the aggregate facts of this case"). Furthermore, the fact that CWs supplied some of this information does not negate its strength, because much of that information was corroborated by toll record analysis and surveillance photos. See United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993) ("The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable. Information may be sufficiently reliable to support a probable cause finding if . . . it is corroborated by independent evidence.") The district courts did not commit clear error in finding the government's wiretap application supported by probable cause.

## 2. Necessity of the Wiretap

Thompson and DeLeo also argue that the district courts should have suppressed the wiretap evidence because the government failed to prove the necessity of the wiretap. Before granting an application for a wiretap, a judge must first determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c); see also United States v. Jackson, 345 F.3d 638, 644 (8th Cir. 2003) ("The necessity requirement of § 2518 insures that wiretaps are not routinely employed as the initial step in an investigation." (internal quotation marks omitted)). We have interpreted this requirement to "restrict wiretaps to [situations in which they] are necessary as well as reasonable," but not to require the government to show "the exhaustion of 'specific' or 'all possible' investigative techniques before wiretap orders could be issued." United States v. Daly, 535 F.2d 434, 438 (8th Cir. 1976). "Whether the statutory requirement is met is to be determined by the issuing judge in a commonsense manner, and the determination is a finding of fact, which can be

reversed only if clearly erroneous." United States v. Macklin, 902 F.2d 1320, 1327 (8th Cir. 1990).

Thompson and DeLeo argue that in both the initial wiretap order and the subsequent orders, the government failed to show that it could not gather information with other investigative methods before seeking a wiretap authorization. They also argue that the government's showing of necessity was based generally on gambling offenses and was not case specific. These arguments are unsupported by the facts included in the government's affidavit supporting its request for a wiretap. First, the government extensively utilized other methods of investigation before resorting to wiretaps. These investigative methods included the development of a confidential witness, the use of telephone toll records, and trash pulls and seizures. Second, the affidavit supporting the government's application for a wiretap explained that these methods, while yielding some information, were insufficient "for the purpose of discovering the full scope of the conspiracy, the full extent of the criminal activities, and to identify and successful prosecute each member of the organization." Jackson, 345 F.3d at 644. Specifically, there was concern that the CWs, in addition to passing information to the government, were also passing information back to the members of the gambling business. The utility of trash pulls and seizures was also compromised by Thompson's habit of burning betting slips weekly instead of merely throwing them out. We cannot say that the district court committed clear error in determining these facts supported a showing of necessity for both the initial and subsequent wiretap authorizations. See United States v. West, 589 F.3d 936, 939 (8th Cir. 2009) (holding the district court did not err in finding necessity where the government's affidavit detailed the use of other investigative techniques and explained why these techniques were dangerous or ineffective under the circumstances); Jackson, 345 F.3d at 644.

### 3. Franks Hearing

Finally, Thompson argues that the district court erred in failing to grant a Franks hearing to examine the credibility of two CWs whose testimony partially supported the affidavit. See Franks v. Delaware, 438 U.S. 154, 155–56 (1978). Thompson specifically argues that the government omitted facts from the affidavit in order to mischaracterize the criminal history of the CWs and make them appear honest and reliable. This court reviews a district court's denial of a Franks hearing for abuse of discretion. United States v. Fairchild, 122 F.3d 605, 610 (8th Cir. 1997).

In order to establish the necessity of a Franks hearing where a defendant alleges a factual omission from the affidavit supporting the search warrant, the defendant bears the burden of showing: "(1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." United States v. Reinholz, 245 F.3d 765, 774 (8th Cir. 2001). "[R]ecklessness may be inferred from the fact of omission of information from an affidavit . . . only when the material omitted would have been clearly critical to the finding of probable cause." United States v. Ozar, 50 F.3d 1440, 1445 (8th Cir. 1995) (internal quotation marks omitted).

Here, Thompson argues that the affidavit minimized the criminal history of the government's two confidential witnesses. CW1, a former police officer, had been convicted of passing fraudulent checks and was forced to resign from the police force. Regarding CW1, the affidavit stated:

> Prior to his work for THOMPSON, CW1 served as a local law enforcement officer, but resigned when CW1 was charged with theft by an ex-girlfriend; these charges were ultimately dismissed. CW1 is currently on probation after being convicted of nonpayment of checks in connection with a failed business effort.

Regarding CW2, the affidavit stated that "Confidential Witness 2 (CW2) has previously been convicted for illegal drug offenses." Thompson argues that both descriptions of the CWs' criminal histories are conclusory and minimize the breadth of their criminal backgrounds.

Thompson is perhaps correct that the affidavit presented the CWs' criminal histories in the least damaging light, but this alone is not sufficient to mandate a Franks hearing. First, Thompson has not pointed to any material misstatement of fact; his complaint, rather, is that the criminal histories, while disclosed, were minimized. See Ozar, 50 F.3d at 1445. Second, even if the criminal histories were materially misstated, any misstatement regarding those histories would not undermine the probable cause established by the affidavit. The testimony of the CWs comprised only part of the evidence compiled against the defendants. The affidavit also included evidence obtained by surveillance of gambling runs and toll record analyses of Thompson's meetings with his bettors, video surveillance of several places in which Thompson conducted gambling business, evidence of Thompson's wealth and historical participation in the gambling business, and toll records showing voluminous communications between Thompson and other members of the gambling business. In light of this evidence, the material omitted from the descriptions of the criminal histories, if any, is insufficient to negate the district court's finding of probable cause in this case. See id. (holding that probable cause was not undermined where other evidence supporting the charge was unchallenged); see also United States v. Carnahan, 684 F.3d 732, 735 (8th Cir. 2012) ("Omitting that a confidential informant has a criminal record or is cooperating does not satisfy [the] rigorous standard [of reckless disregard for the truth] when the informant's information is partially corroborated or his general credibility is otherwise not significant to the probable cause inquiry.").

B. Severance

Thompson and Baggett assert several rationales for why their cases and the charges against them should not have been tried together. Thompson argues that the cases should have been severed because they were not alleged to have participated in the same act or transaction, as required by Federal Rule of Criminal Procedure 8(b). Baggett argues that his case should have been severed from Thompson's because he was prejudiced by Thompson's assertion of his Fifth Amendment rights and consequent refusal to testify. Finally, Thompson argues that the individual charges against him should have been severed because these offenses were not "of the same or similar character, . . . based on the same act or transaction, or . . . parts of a common scheme or plan" as required by Federal Rule of Criminal Procedure 8(a). Although Thompson and Baggett raise these issues in their briefs as both joinder and severance issues, they do not appear to have contested the joinder, which occurred when the defendants were jointly indicted, below. Accordingly, we review only the district court's denial of Thompson's and Baggett's motions to sever. "We will not reverse a denial of a motion to sever unless the appellant demonstrates an abuse of discretion resulting in clear prejudice." United States v. Lewis, 557 F.3d 601, 609 (8th Cir. 2009) (internal quotation marks omitted).

1. Same Act or Transaction

Thompson claims that the district court improperly joined and refused to sever his cases from Baggett's, as required by Federal Rule of Criminal Procedure 8(b) (joinder of offenses is proper if the offenses charged "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses"). With respect to coconspirators, joinder may be proper where there is "an overall scheme in which each conspiracy member participated." United States v. Liveoak, 377 F.3d 859, 865 (8th Cir. 2004). "Importantly, not every defendant joined must have participated in every offense

charged." United States v. Delpit, 94 F.3d 1134, 1143 (8th Cir. 1996). Rather, in general, "'persons charged in a conspiracy or jointly indicated on similar evidence from the same or related events should be tried together.'" United States v. Lewis, 557 F.3d 601, 609 (8th Cir. 2009) (internal quotation marks omitted).

Thompson argues his case should not have been tried with Baggett's because the offenses for which the two men were tried were not part of an "overarching conspiracy" and were therefore not part of the same series of acts or transactions. Although it is true that Baggett was only indicted for firearms offenses, whereas Thompson was indicted for firearms, gambling, and immigration offenses, these charges are nevertheless all part of the same overarching scheme in which Thompson made money by operating an illegal gambling business, selling firearms, and receiving money in exchange for arranging a marriage to contravene immigration laws. See Liveoak, 377 F.3d at 865 (holding that "[t]hough charges linked merely by common conspiracy members may not be joined," the particular charges were properly joined because they were "linked not only by common conspiracy members, but also by an overall scheme in which each conspiracy member participated to fraudulently charge the government for health care costs"). Furthermore, the significant overlap in evidence relevant to these two defendants indicates that joinder was proper here. See United States v. Pou, 953 F.2d 363, 368 (8th Cir. 1992) ("Ordinarily, indicted coconspirators should be tried together, especially where the proof of conspiracy overlaps."). The cases against both men required evidence of the sources of Thompson's income, Thompson's relationship with Baggett, and Baggett's knowledge of Thompson's criminal history and activities.

"The presumption against severing properly joined cases is strong." United States v. Ruiz, 412 F.3d 871, 886 (8th Cir. 2005). The district court instructed the jury that it "must give separate consideration to the evidence about each individual defendant" and it "must consider, separately, each crime charged against each individual defendant." The mere "possibility that a defendant's chances for acquittal

-14-

may be better in separate trials is an insufficient justification for severance." Id. at 887; see also Pou, 953 F.2d at 368–69 ("This preference for joint trials is not limited by any requirement that the quantum of evidence of each defendant's culpability be quantitatively or qualitatively equivalent." (internal quotation marks omitted)). The district court did not abuse its discretion by denying Thompson's motion.

### 2. Prejudice to Baggett From Thompson's Refusal to Testify

Baggett argues that the district court improperly denied his motion to sever his and Thompson's trials, because Thompson's assertions of his Fifth Amendment right to not testify prejudiced Baggett by denying Baggett's right to present a complete defense and his right to compel a witness in his favor to testify. Had the trials been separate, Baggett asserts, Thompson would have testified that he did not tell Baggett he was a felon until after Baggett provided him with firearms. Therefore, Baggett could not have been convicted of charges that he aided and abetted a felon's possession of a firearm, conspired to dispose of ammunition to a felon, and made false statements to agents of the Bureau of Alcohol, Tobacco, and Firearms about these incidents.

However, "[s]everance is not mandated simply because a codefendant might testify and thereby only increase the chances of acquittal or tend to rebut some aspect of the government's case. Exculpation is required." United States v. Foote, 920 F.2d 1395, 1400 (8th Cir. 1990) (internal citation and quotation marks omitted). Here, even if Thompson would have testified at a solo trial for Baggett,[3] the testimony he

---

[3]For evidence that Thompson would have testified at a separate trial for Baggett, Baggett points only to Thompson's failure to deny Baggett's statement that Thompson would testify at a pretrial hearing. However, the government argues that Thompson would not likely testify, pointing to an ongoing prosecution of Thompson in Massachusetts, for which there is no known end date. It is not clear that Baggett has demonstrated a sufficient likelihood that Thompson would testify in his favor.

would have provided would not have been exculpatory. The government has several probative pieces of evidence to rebut potential testimony by Thompson that Baggett did not know of Thompson's felony status. Most convincingly, this evidence includes a letter Baggett wrote to a state court judge in 2003, stating that he had known Thompson for nearly twenty years and asking the judge to show mercy to Thompson at a criminal sentencing. Such evidence would cast serious doubt on any testimony by Thompson that Baggett did not know of his felony status and on the chances that such testimony would exculpate Baggett. Thus, the district court did not commit an abuse of discretion resulting in clear prejudice when it denied Baggett's motion to sever.

### 3. Charges Against Thompson

Thompson argues the district court erred in denying his motion to sever the charges against him. See Fed. R. Crim. P. 8(a) (joinder of offenses against the same defendant is proper where those offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan"). Because Thompson could not testify regarding his felon-in-possession-of-firearms charges without incriminating himself, he also chose to not take the stand to address the gambling and marriage fraud charges, for which he viewed his testimony as important.

These facts do not establish clear prejudice to Thompson sufficient to render the district court's decision an abuse of discretion. "[A] defendant does not suffer any

See United States v. Crumley, 528 F.3d 1053, 1063–64 (8th Cir. 2008) ("It is not enough for a defendant to claim that he needed a separate trial in order to call a co-defendant as a witness. He must show that it is likely his codefendant would have testified and that the testimony would have been exculpatory." (internal marks and alterations omitted)).

undue prejudice by a joint trial if the evidence is such that one crime would be probative and admissible at the defendant's separate trial of the other crime." United States v. Little Dog, 398 F.3d 1032, 1037 (8th Cir. 2005) (internal quotation marks omitted). Evidence presented at trial showed that Thompson received firearms as payment for gambling debts, and that the person Thompson aided and abetted in committing marriage fraud was also an agent of Thompson's gambling business. Thus, even if the district court had granted the motion to sever, allowing Thompson to testify at one trial for the gambling and marriage charges, his testimony would likely have opened the door to questions about the firearms charges. Thompson did not suffer clear prejudice and the district court did not abuse its discretion.

## C. Thompson's Other Evidentiary Challenges

Thompson challenges two other evidentiary rulings from his trial with DeLeo. First, he argues that the district court admitted evidence of a prior arrest as improper character evidence, in violation of Federal Rule of Evidence 404. Second, he claims the district court improperly admitted evidence of Thompson's travel to China as evidence of flight. We review both evidentiary rulings for abuse of discretion, "and will disturb a district court's decision only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." United States v. Franklin, 250 F.3d 653, 658 (8th Cir. 2001) (internal quotation marks omitted).

### 1. Evidence of Thompson's Prior Arrest

Thompson first argues that evidence of a prior arrest for drug trafficking was improperly admitted as character evidence. Federal Rule of Evidence 404(b) prohibits "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the

-17-

character," but allows this evidence for other purposes, such as to show knowledge or intent.

The evidence at issue is a transcript of a telephone call between Thompson and DeLeo, in which Thompson discusses Tri Cam Le, who was trafficking cocaine for Thompson, having been stopped on the interstate and found to be in possession of "2.2 kilos." In that call, Thompson tells DeLeo that Le's bond is "really low," and says: "Yeah. Donna said it was 50,000, they, hell they caught me with six grams. They caught me with six grams and charged me a 100,000 bond." We first note that this statement might not be character evidence at all, and Federal Rule Evidence 403 might thus be more apt to analyze its admissibility. Even assuming the statement was character evidence, however, it was not inadmissible. The government introduced the statement as evidence of Thompson's intent to distribute illegal drugs, to refute Thompson's and DeLeo's defense that they were ignorant of Le's drug trafficking activities. The quoted statement shows Thompson's knowledge of the drug trafficking business. "[E]vidence of prior possession of drugs, even in an amount consistent only with personal use, is admissible to show such things as knowledge and intent of a defendant charged with a crime in which intent to distribute drugs is an element." Franklin, 250 F.3d at 658 (internal quotation marks omitted). Moreover, the district court gave a limiting instruction to the jury, reminding the jurors that "even if you find that Mr. Thompson may have committed a similar act in the past, this is not evidence that he committed such an act in this case. . . . [Y]ou may consider the evidence of the prior act only on the issue of knowledge." This limiting instruction further minimized any danger that the jury would interpret Thompson's statement merely as character evidence, and there was no error in allowing the government to introduce it.

## 2. Evidence of Thompson's Flight

Thompson also argues that the district court erred in admitting evidence that he traveled to China after the government searched his home and another property he owned as evidence of flight indicating consciousness of guilt. It is "well established" that evidence of flight

> is admissible and has probative value as circumstantial evidence of consciousness of guilt. . . . [I]t is today universally conceded that the fact of an accused's flight, *escape from custody*, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself."

United States v. Hankins, 931 F.2d 1256, 1261 (8th Cir. 1991) (internal quotation marks omitted). Whether evidence of flight is circumstantial evidence of guilt depends on

> the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

Id. (internal quotation marks omitted).

In this case, the district court considered the four factors and determined that evidence of Thompson's flight was circumstantial evidence of his guilt:

> Here, you know, the issue is whether there's evidence that would link the potential, the flight or the trip to China to consciousness of guilt, not only of the crime, but of the specific crime that's charged here. And the evidence has shown, I mean, I think that the jury could conclude from

-19-

the wiretap telephone conversation that there was a great deal of concern on the part of Mr. Thompson with respect to Tri Cam Le and his arrest and a great deal of effort on his part to deal with that situation. And then the first overt signal that he might be implicated was the search warrant and the search of the premises in May. And there were specific items of evidence seized in that search warrant that relate back to the telephone conversations and this whole thing with Tri Cam Le. And shortly after that, there was a withdrawal of money and the trip to China. So I think there's a sufficient connection for the flight to have probative value, and furthermore, I think the probative value is not outweighed by danger of unfair prejudice.

Thompson argues that he fled to China not because of the potential drug charge, but rather because of concern "only with the penalty he would face if convicted of being a felon in possession." The line Thompson draws is a thin one. Moreover, although a jury could potentially view the evidence as Thompson presents it, this alternative theory is insufficiently convincing to render district court's interpretation and admission of it an abuse of discretion.

### D. The Search of the Storage Room Outside of DeLeo's Apartment

DeLeo argues that the district court erred in denying his motion to suppress evidence the government collected from a storage room outside his apartment. We review a trial court's factual findings underlying a motion to suppress for clear error and its legal conclusions de novo. United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005).

"When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of the authorization." United States v. Ware, 890 F.2d 1008, 1011 (8th Cir. 1989) (emphasis and internal quotation marks omitted). In Ware, we affirmed a district court's refusal to suppress evidence. The defendant in that case consented to a search

of his apartment for drugs, and officers also searched a storage room right outside his apartment, ostensibly under that consent. We found that search did not exceed the scope of defendant's consent:

> Ware's lease of the apartment included the storage bin and he was provided with a key giving access to the storage room. The storage room was next door to Ware's apartment, near enough to alert the searching officers that it was an appurtenance of the apartment, a fact confirmed when the officers found that Ware's key ring included the keys to both the storage room door and the locked bin.

Id.; see also United States v. Principe, 499 F.2d 1135, 1137 (8th Cir. 1974) (holding that officers could "reasonably suppose" that a search warrant for a defendant's apartment also included a cabinet in hallway three to six feet away from the door of that apartment).

In this case, the search warrant authorized a search of "17 Russell Street, Apartment 9, Basement" in Somerville, Massachusetts. Under this authority, federal agents also searched a storage room in the hallway of that apartment building and recovered ten grams of cocaine. While this storage room was not part of DeLeo's apartment, DeLeo kept the key to it on his key ring. The agents used the key on DeLeo's key ring to access the storage unit. Furthermore, DeLeo's apartment was the only one in the basement, and his apartment had no number on the door. Finally, inside the storage room, officers found a locked box bearing DeLeo's initials (RFD) and warning people not to touch it. The officers were thus reasonable in their belief that the storage room was appurtenant to DeLeo's apartment, and the district court did not err in refusing to suppress the evidence.

## E. Ineffective Assistance of Counsel

"We review the district court's denial of a motion for new trial based on ineffective assistance of counsel for abuse of discretion." United States v. Hubbard, 638 F.3d 866, 870 (8th Cir. 2011). Such claims are "generally best litigated in collateral proceedings, such as an action under 28 U.S.C. § 2255." Id. at 869. A defendant may only bring an ineffective assistance claims on direct appeal "where the record has been fully developed, where not to act would amount to a plain miscarriage of justice, or where counsel's error is readily apparent." Id. (internal quotation marks omitted).

The Court has, "on occasion," found the trial court record sufficiently developed to allow a defendant to bring an ineffective assistance of counsel claim on direct appeal. Id. (holding we could review the ineffective assistance claim because the district court held an evidentiary hearing on that issue); see, e.g., United States v. Williams, 562 F.3d 938, 941–42 (8th Cir. 2009) (finding a sufficiently developed record when potential trial witnesses testified at the post-trial hearing); United States v. Villalpando, 259 F.3d 934, 938–39 (8th Cir. 2001) (noting that, although the district court did not conduct a hearing, we were able to observe trial counsel's "poor" representation at trial); United States v. Williams, 897 F.2d 1430, 1434 (8th Cir. 1990) (finding a sufficiently developed record when trial counsel and an investigator testified at a post-trial hearing that they contacted a potential witness alleged to have exculpatory evidence, and determined that his testimony would not have affected the outcome of the case). In all of these cases, however, the trial court was able, either through its own observations or via testimony from a hearing, to observe the performance of defense counsel and draw relatively unbiased conclusions about the quality of that performance.

Here, the evidence underlying DeLeo's claim for ineffective assistance is not sufficiently developed. The bulk of the alleged misconduct DeLeo identifies occurred

away from the courtroom. DeLeo points to his own pro se motions for a new trial and to his attempts to discharge his attorneys as evidence of the ineffective assistance. He also complains that his attorneys did not sufficiently prepare for trial and that they did not allow him to testify as much as he wanted. These claims, complex and intertwined with trial strategy, are best left for a 28 U.S.C. § 2255 proceeding.

## F. Sufficiency of the Evidence Against Baggett

The district court did not err in denying Baggett's motion for acquittal. This Court reviews a district court's denial of a motion for acquittal de novo, but will only reverse if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. United States v. Espinosa, 585 F.3d 418, 423 (8th Cir. 2009). Where there are conflicting views of the evidence, the Court resolves those conflicts "in favor of the government, and accept[s] all reasonable inferences supported by the evidence." Id. (internal quotation marks omitted).

Baggett argues that the evidence was insufficient to support three of the charges for which he was convicted. These charges are count six, aiding and abetting a felon in possession of a weapon; count seven, false statements to a federal agent; and count nine, conspiracy to obtain ammunition for a felon. For each of these three counts, Baggett's argument that there was insufficient evidence for conviction centers on his assertion that the government did not present sufficient evidence to show that Baggett knew or should have known that Thompson was a felon at the time of the weapon and ammunition sale, or at the time of his statements to federal agents. This argument is unavailing. The government presented evidence of (1) a letter Baggett wrote to the judge in Thompson's Pulaski County criminal case in 2003 stating that he had known Thompson for twenty years, and that Thompson was "a good man and deserve[d] mercy" in sentencing; and (2) a telephone call between Baggett and Thompson in which the two men discussed options to get a gun to Thompson without it being registered in his name. This evidence is sufficient to allow a reasonable jury

-23-

to conclude that Baggett was aware of Thompson's felony status at the time Baggett sold Thompson a gun. See United States v. Hyles, 521 F.3d 946, 955–56 (8th Cir. 2008) (finding sufficient evidence to show that defendant knew the person to whom she provided a weapon was a felon because she had known him her whole life and she signed his bond papers, which indicated he was charged with felony stealing).[4]

With regard to count six, Baggett also challenges the government's proof on the issue of whether Thompson constructively possessed the gun Baggett sold on his behalf. The government presented evidence that Baggett was holding Thompson's gun for him and attempting to sell it to others. Most importantly, it introduced a telephone call between Thompson and Baggett in which the two men discussed another person's interest in buying the gun and what price Thompson found acceptable. This is sufficient evidence to allow a reasonable jury to find that Thompson constructively possessed the gun at that time. See United States v. Ali, 63 F.3d 710, 715 (8th Cir. 1995) (approving the same jury instruction given in this case, which defines constructive possession as occurring when "[a] person who, although

---

[4]Hyles also holds that knowledge of the law is not an element of the crime of delivering a firearm to a felon. Hyles, 521 F.3d at 956. In other words, it is not necessary for conviction to know that providing a felon with a firearm is unlawful. The case does not state that knowledge of the *fact* that the person to whom a defendant delivers a firearm is a felon is not an element of this offense, nor could it correctly do so. Like other aiding and abetting crimes, aiding and abetting a felon in possession of a firearm requires the government to prove the defendant acted purposefully as to all elements of the crime. See Bailey v. United States, 29 F.3d 627, at *1 (8th Cir. 1994) (unpublished) ("To prove aiding and abetting, the government must prove the defendant had a 'purposeful attitude' or knowingly participated in the activity."); United States v. Ivey, 915 F.2d 380, 385 (8th Cir. 1990) ("To establish aiding and abetting liability under 18 U.S.C. § 2, the government must prove that the defendant had a 'purposeful attitude,' defined as affirmative participation which at least encourages the perpetrator."). Here, the government must prove a purposeful attitude as to both delivering a firearm and delivering it to a felon.

not in actual possession, has both the power and the intention at a given time to exercise control over a thing, either directly or through another person or persons").

Finally, with regard to count nine, Baggett argues that he cannot be convicted of conspiracy to obtain ammunition for a felon because he was not aware of "federal laws regulating the sale of ammunition to felons." However, knowledge of the law is not required for conviction. Baggett need only know "of the facts constituting the offense," and here, the government has shown that he did. United States v. Hutzell, 217 F.3d 966, 968 (8th Cir. 2000).

G. Double Jeopardy

The final issue on appeal is Thompson's claim that the Double Jeopardy Clause forbade the district court from reversing its initial grant of the motion for judgment of acquittal. At the close of the government's case, Thompson moved for judgment of acquittal as to all counts against him. The district court denied the motion, except as to count five, which it took under advisement and then granted. After the court granted this motion, Thompson rested without putting on a case. Baggett subsequently began his case. After Baggett called several witnesses, the court ordered a recess, expressed that it thought it made a mistake in granting the motion, and asked the parties for law on whether it could reverse itself. The following morning, the court determined reversal was appropriate and denied the motion for judgment of acquittal on count five. At the close of trial, the jury returned a verdict of guilty on that count.

"We review de novo the District Court's decision on questions of law, including the application of . . . the Double Jeopardy Clause." United States v. Brekke, 97 F.3d 1043, 1046–47 (8th Cir. 1996). Once a defendant has been acquitted, either by judge or by jury, "subjecting the defendant to postacquittal factfinding proceedings going to guilt or innocence violates the Double Jeopardy

-25-

Clause." Smalis v. Pennsylvania, 476 U.S. 140, 145 (1986). The Supreme Court has defined an "acquittal" as a decision "actually represent[ing] a resolution, correct or not, of some or all of the factual elements of the offense charged." Smith v. Massachusetts, 543 U.S. 462, 468 (2005) (quoting United States v. Martin Linen Supply Co., 430 U.S. 564, 571 (1977)).

In Smith, the Supreme Court confronted an issue similar to the one here. There, in a trial of two defendants, the trial court granted one defendant's—Smith's—motion for judgment of acquittal on one of the several charges against him after the prosecution rested its case. After this point, the defense put on its case: Smith's codefendant called one witness, and then both defendants rested. At this point, the court decided it had made a mistake and reversed its earlier ruling, this time denying Smith's motion for judgment of acquittal. The jury then found Smith guilty of the originally-dismissed charge, among others. After determining that the trial court's initial grant of Smith's motion was an acquittal, the Court went on to consider if "the Double Jeopardy Clause permitted [the judge] to reconsider that acquittal once petitioner and his codefendant had rested their cases." Smith, 543 U.S. at 469. The Court first noted that "the facts of this case gave petitioner no reason to doubt the finality of the state court's ruling. . . . Nor did the court's ruling appear on its face to be tentative." Id. at 470. It then held the following:

> The Double Jeopardy Clause's guarantee cannot be allowed to become a potential snare for those who reasonably rely upon it. If, after a facially unqualified midtrial dismissal of one count, the trial has proceeded to the defendant's introduction of evidence, the acquittal must be treated as final, unless the availability of reconsideration has been plainly established by pre-existing rule or case authority expressly applicable to midtrial rulings on the sufficiency of the evidence.

-26-

Id. at 473. Accordingly, the Court found the trial court's reversal of its judgment of acquittal and subsequent submission of that charge to the jury to be a double jeopardy violation. Id.

In contrast to Smith, the Eleventh Circuit found no double jeopardy violation in United States v. Hill, 643 F.3d 807 (11th Cir. 2011), where the trial court granted a motion for judgment of acquittal at the beginning of a motions hearing, then dismissed it at the end of the same hearing. Id. at 865–66. The Eleventh Circuit held that, although the initial grant was a judgment of acquittal, the reversal did not cause a double jeopardy violation. Id. at 867. Unlike in Smith, in Hill, "the matter was 'resolved satisfactorily before [the defendant] went forward with his case.'" Id. (quoting Smith, 543 U.S. at 475). And, the court reasoned, "that makes all the difference. Nothing was done, or could have been done, in reliance on the acquittal ruling between the time that ruling was announced and the time it was rescinded." Id.

Turning to the facts of this case, the district court's initial ruling, like that in Smith and Hill, was a judgment of acquittal: it was a determination that the government had not met its burden of proof on count five. Like the defendant in Smith, Thompson had no reason to doubt the finality of this ruling, and there was no indication on its face that the ruling was tentative. When the district court initially granted Thompson's motion for judgment of acquittal, it did so unequivocally, without making any indication of any availability of reconsideration: "Motion for judgment of acquittal as a matter of law on [count] 5 is granted, exception saved." Moreover, there was significant process in the trial between the district court's initial grant of the motion for judgment of acquittal and its subsequent reversal. Not only did Thompson's defense rest, but his codefendant, Baggett, began putting on evidence. Like the Supreme Court in Smith, we will not allow "[t]he Double Jeopardy Clause's guarantee [to] be allowed to become a potential snare for those who reasonably rely upon it." Smith, 543 U.S. at 473. Once Thompson had rested his

-27-

case, relying at least in part on the district court's judgment of acquittal, double jeopardy attached and the reversal of that judgment was a constitutional violation.

Accordingly, we reverse Thompson's conviction on count five, for possession of a Sig Sauer pistol. However, this does not end our inquiry on this issue. After trial, the district court sentenced Thompson to 103 months' imprisonment on counts one, five, and eight, which was to run concurrently with a 120-month sentence on count ten. These sentences would run consecutively to an undischarged term of 121 months' imprisonment imposed in another case. Where we reverse one of several of a defendant's criminal convictions, we remand for resentencing if "we are uncertain whether [the district court] would have imposed the same or somewhat lesser sentences for the remaining convictions as it did originally." United States v. Schwartz, 924 F.2d 410, 426 (2d Cir. 1991). Here, the 103-month sentence of which count five is a part is shorter than the sentence with which it runs concurrently, the 120-month sentence for count ten. That sentence is undisturbed by this appeal. We thus do not remand for resentencing, because the vacated conviction would not affect Thompson's sentence for the remaining convictions. See United States v. White Bull, 646 F.3d 1082, 1086 (8th Cir. 2011).[5]

## III. Conclusion

Accordingly, we affirm the district courts on all issues, except for Thompson's double jeopardy claim. On that issue, we reverse Thompson's charge on count five in case number 11-2604, of being a felon in possession of a firearm.

———————————————————

[5]We do order that the $100 special assessment as to count five be vacated.