# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3750

_____

United States of America,

Appellee,

v.

Bernard NMN Gaines, aka Smiley,

Appellant.

_____

No. 09-3754

_____

United States of America,

Appellee,

v.

Jerry Martese Dubose, aka Ray,

Appellant.

                   Appeals from the United States
                   District Court for the
                   District of Minnesota.

_____

Submitted: October 21, 2010
Filed: May 4, 2011

_____

Before LOKEN, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Bernard Gaines and Jerry Dubose, along with twelve others, were indicted for their alleged involvement in a conspiracy to distribute cocaine and crack cocaine. Ultimately, Gaines pleaded guilty and, subsequently, testified against Dubose, who elected to stand trial. Prior to his trial, Dubose moved to suppress recordings of wiretapped telephone conversations that he had with his alleged coconspirators, arguing that the recordings were obtained in violation of his rights under the Fourth Amendment because the initial wiretap application and resulting order failed to particularly identify all potential conversants who might be overheard on the wiretapped phone line. The district court[1] denied Dubose's motion, and, following a two-day trial at which Gaines testified, a jury found Dubose guilty. Thereafter, at Gaines's sentencing, the district court found Gaines to be a "manager or supervisor" of the drug conspiracy under U.S.S.G. § 3B1.1(b) and applied a three-level enhancement to his base-offense level pursuant to that provision. Gaines and Dubose appeal. Gaines appeals the district court's determination that he was a manager or supervisor of the conspiracy, and Dubose appeals the district court's denial of his pretrial motion to suppress. We affirm both judgments.

## I. *Background*

In August 2007, Minneapolis Police and the Federal Bureau of Investigation (FBI) commenced "Operation Sabotage" (OS), a joint effort between local and federal law enforcement to interdict a drug network believed to operate between Chicago, Illinois, and Minneapolis, Minnesota. On February 21, 2008, after several months of "traditional" investigative methods by OS agents, including visual surveillance, search warrants, garbage pulls, and controlled purchases of narcotics, the United States Attorney's Office applied to the United States District Court for the District of

---

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

Minnesota, for a wiretap order pursuant to 18 U.S.C. § 2518 ("Title III").[2] The application sought authorization to intercept calls to and from a "target" cellular phone purportedly subscribed to the username of "Vegas Smith" and linked to the billing name of a "Joe Green" residing in St. Paul, Minnesota. The application asserted that Mario Leon Tyson actually owned and used the target phone. In support of the wiretap application, FBI Special Agent James Somerville submitted the statutorily required affidavit, identifying Tyson and other named individuals believed to be engaged in the drug network. Specifically, Agent Somerville swore that "'there is probable cause to believe Mario Tyson, Bernard Gaines, . . . and others as yet unknown, have committed and are committing, and will continue to commit violations of [several firearm, drug trafficking, and money laundering offenses].'" Additionally, Agent Somerville swore that he had probable cause to believe a wiretap of the target phone would intercept conversations of Tyson, Gaines, and others discussing their crimes. Agent Somerville's affidavit made no mention of Dubose.

A District of Minnesota district judge authorized the requested 30-day wiretap surveillance of Tyson's phone. Beginning on February 25, law enforcement commenced the surveillance, intercepting 15 "pertinent calls" between Tyson and Dubose. On March 17, 2008, the United States Attorney's Office successfully applied for authorization to tap a second target phone, this time naming Dubose as a participant in the drug network. Agent Somerville's affidavit noted Dubose's involvement on the previously intercepted calls to establish probable cause. Finally, on March 31, 2008, the United States Attorney's Office successfully applied for a third wiretap, again naming Dubose in the application as a criminal participant whose conversations it aimed to intercept.

---

[2]Section 2518 is part of the federal wiretap statute formally known as Title III of the Omnibus Crime Control and Safe Streets Act of 1968. 18 U.S.C. §§ 2510–2522.

On July 22, 2008, Gaines, Dubose, and 12 others were indicted, each charged with one count of conspiracy to distribute cocaine and crack cocaine. Gaines pleaded guilty and ultimately testified against Dubose, who elected to stand trial. Dubose moved to suppress the evidence obtained by the wiretaps. The district court denied Dubose's motion to suppress. After reviewing Agent Somerville's affidavit, the district court concluded that it "set[] forth sufficient probable cause that 'others yet unknown' were involved in the alleged drug trafficking[,]" and that "[w]hile [Dubose] challenges the amount of information contained in the affidavit devoted to whether 'others unknown' were involved in the conspiracy, the Court is not to review supporting affidavits 'in a hypertechnical manner, but rather with an eye toward a commonsense determination.'" The district court concluded that "the affidavits viewed as a whole set forth sufficient facts to support a reasonable belief a crime was being committed, and that others unknown were involved."

Thereafter, Dubose's case proceeded to trial, where Gaines testified against him, implicating Dubose and others in the drug network. Following a two-day trial, the jury found Dubose guilty on the sole drug-conspiracy count, and, subsequently, the district court sentenced Dubose to 120 months' imprisonment.

For Gaines's part, he testified at Dubose's trial that between 2006 and 2008, he (Gaines) purchased cocaine in kilo quantities on two occasions from Dexter Fields, the apparent Chicago-based supplier of the entire Minneapolis-based consortium to which Gaines was a party. According to the factual recitation in Gaines's presentence investigation report (PSR), to which he took no exception,[3] "in approximately March 2008, Gaines traveled to Chicago and purchased one kilogram of cocaine from Fields and Nelson for $23,000," and, subsequently, Gaines "sold 500 grams of cocaine to others and converted the remaining 500 grams into cocaine base before distributing

---

[3]"[U]nless a defendant objects to a specific factual allegation contained in the PSR, the court may accept that fact as true for sentencing purposes." *United States v. Davis*, 583 F.3d 1081, 1095 (8th Cir. 2009) (internal quotations and citations omitted).

it to others." The PSR further provides that, on a different, undisclosed date, "Gaines purchased another [one] kilogram of cocaine from Fields through Nelson for an additional $23,000."

Gaines's testimony at Dubose's trial, coupled with the PSR's unobjected-to findings, reveals that Gaines's primary enterprise responsibilities included dividing, preparing, packaging, and distributing cocaine to lower distributors and sellers. In his brief to this court, Gaines summarized his trial testimony by stating that, upon receiving powder cocaine in bulk from Fields in Chicago, he "would then separate the powder cocaine into '9's, 4's, and 63's,'" a "9" being nine ounces, a "4" being four and one-half ounces, and a "63" being 63 grams of cocaine. Finally, Gaines confirms that, "[a]t various times, [he] sold cocaine to co-defendants Turnipseed, Woods, Tyson, Dubose, Holmes, Robinson, Shoals, Griffin, Kirk, and Lloyd," and further, that Gaines "set the price on the cocaine he sold" to these individuals, but notes that "[t]here is no evidence . . . that [he] told others what to charge for the cocaine they would resell." The PSR matched Gaines's testimony and supplements that, "[f]ollowing a proffer session with the authorities, a firearm and 441 grams of cocaine base was recovered from Gaines'[s] residence." Moreover, "[i]ncluding the 243.84 grams of cocaine found in his vehicle" upon apprehension, "Gaines agreed that he is responsible for at least 500 grams but less than 1.5 kilograms of cocaine base."

On November 18, 2009, the district court agreed with the PSR's recommendation that Gaines was a manager or supervisor of the drug conspiracy and applied a three-level enhancement to his base-offense level pursuant to U.S.S.G. § 3B1.1(b). However, in recognition of Gaines's cooperation with authorities and testimony at Dubose's trial, the district court departed below the advisory Guidelines range of 262 to 327 months' imprisonment and instead sentenced Gaines to 144 months' imprisonment.

Gaines and Dubose each appeal. Gaines appeals the district court's imposition of a three-level role enhancement. Dubose appeals the district court's denial of his pretrial motion to suppress, maintaining that the recorded telephone conversations used as evidence against him at trial were procured in violation of the Fourth Amendment's requirement that a search warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S Const. amend. IV. We consolidated their appeals and now affirm both judgments.

## II. *Discussion*
### A. *Gaines's Role Enhancement Under U.S.S.G. § 3B1.1(b)*

The district court did not clearly err in finding that Gaines was a manager or supervisor of the underlying drug conspiracy to which he was a party. Section 3B1.1(b) provides as follows:

> Based on the defendant's role in the offense, increase the offense level as follows: . . . (b) If the defendant was a manger or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

Gaines concedes in his brief "that the criminal activity involved five or more participants or was otherwise extensive" but "disputes . . . that he was a manager or supervisor." The government bears the burden of proving by a preponderance of the evidence that the aggravating role enhancement is warranted. *United States v. Garcia-Hernandez*, 530 F.3d 657, 665 (8th Cir. 2008). "'The district court's factual findings, including its determination of a defendant's role in the offense, are reviewed for clear error,' while its 'application of the guidelines to the facts is reviewed de novo.'" *United States v. Bolden*, 622 F.3d 988, 990 (8th Cir. 2010) (quoting *United States v. Vasquez-Rubio*, 296 F.3d 726, 729 (8th Cir. 2002)). Finally, "'[w]e construe the terms 'manager' or 'supervisor' broadly under U.S.S.G. § 3B1.1(b),'" *United States v. Adamson*, 608 F.3d 1049, 1056 (8th Cir. 2010) (quoting *United States v. Erhart*,

415 F.3d 965, 973 (8th Cir. 2005)), and the sentencing court is free to consider factors such as:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* (quoting U.S.S.G. § 3B1.1 cmt. n.4; *United States v. Rosas*, 486 F.3d 374, 376 (8th Cir. 2007)).

Gaines correctly observes that there is no evidence that he: (i) "recruited anyone into the drug conspiracy," (ii) "told anyone where they had to sell their drugs or to whom they could sell them," or (iii) "instructed anyone on how to cook powder cocaine into cocaine base." Nevertheless, we have affirmed a district court's application of the manager/supervisor role adjustment on a very similar factual record. We noted, however, that such facts present a "close question." In *United States v. Vasquez*, the district court found Vasquez to be a manager or supervisor of a methamphetamine ring based largely on the testimony of a coconspirator who stated that when he wished to purchase methamphetamine for resale, he would contact Vasquez, who in turn "would set the price for the methamphetamine depending on the quantity and quality, and tell [the testifying coconspirator] where to meet him." 552 F.3d 734, 738 (8th Cir. 2009). Additionally, the district court relied on the trial testimony of an individual who doubled as Vasquez's purchaser and supplier. *Id.* Specifically, this witness testified that she purchased one-half ounce quantities of methamphetamine from Vasquez between 25 and 30 times, and that, on occasion, she would sell Vasquez methylsulfonylmethane (MSM), a principal cutting agent used to manufacture methamphetamine. *Id.* Presented with these facts, our court concluded that "[a]lthough this issue does present a close question . . . the government presented sufficient evidence, when considered in its totality, to meet its burden of proof," and

"[t]hus, the district court's imposition of three-level role enhancement was not clearly erroneous." *Id.*

Gaines's case is similar to *Vasquez* in key respects. Much like the record in *Vasquez*, the instant record is admittedly scant on the "degree of control," U.S.S.G. § 3B1.1 cmt. n.4, and "decision making authority," *id.*, that Gaines exercised over his accomplices. Still, these are but two of several factors in a non-exhaustive list that the Guidelines advise a sentencing court to consider before imposing a manager/supervisor enhancement.[4] See *id.* (advising that "[f]actors the court should

---

[4]Indeed, despite some likely inaccurate remarks in our case law, we have not imposed a strict condition requiring evidence of control or decision making authority over one or more accomplices as an absolute prerequisite for a manager/supervisor enhancement under U.S.S.G. § 3B1.1. In *United States v. Plancarte-Vazquez*, we stated that, "[f]or a sentencing court to impose a managerial or supervisory role enhancement[,] there *must* be sufficient evidence from which to find that the defendant controlled at least one other participant in the drug trafficking offense.", 450 F.3d 848, 853 (8th Cir. 2006) (emphasis added) (quoting in part *United States v. Mesner*, 377 F.3d 849, 851–52 (8th Cir. 2004)). In *Mesner*, this court concluded that, because "the government was *able* to demonstrate by a preponderance of the evidence that Mesner 'controlled at least one other participant in the drug trafficking offense,'" 377 F.3d at 851–52 (emphasis added) (quoting *United States v. Yerkes*, 345 F.3d 558, 563 (8th Cir. 2003)), the district court "did not clearly err by enhancing Mesner's sentence for being a manager or supervisor of the conspiracy," *id.* at 852. In *United States v. Yerkes*, we stated that, "[t]o receive this enhancement, the Government *need only* prove that 'the defendant controlled at least one other participant in the drug trafficking offense.'" 345 F.3d at 563 (emphasis added) (citing *United States v. Brown*, 311 .3d 886, 890 (8th Cir. 2002)). Finally, in *United States v. Brown*, we stated merely that "[w]e will *uphold* this enhancement if the defendant controlled at least one other participant in the drug trafficking offense." 311 F.3d at 890 (emphasis added). In sum, this circuit's rule that proof of a defendant's control over at least one accomplice is *sufficient* to sustain, under clearly erroneous review on appeal, a manager/supervisor enhancement, has, over the course of several iterations, inadvertently evolved into a rule that such proof is *necessary and* sufficient, *at sentencing*, to procure a manager/supervisor enhancement. More simply, "need only,"

-8-

consider *include* the exercise of decision making authority . . . and the degree of control and authority exercised over others") (emphasis added). Here, as in *Vasquez*, the factors supporting a role enhancement include Gaines's manufacture of the drug to be distributed and his distribution of the end product to others, at a price Gaines set, for redistribution in smaller quantities. These similarities, coupled with (1) the nature and broad scope of the illegal activity, and (2) the nature of Gaines's participation in the crime—both factors which the Guidelines also advise this court to consider—lead us to conclude that the district court did not clearly err in finding Gaines to be a manager or supervisor of the drug network.

### B. *Dubose's Motion To Suppress*

On appeal, Dubose maintains that Agent Somerville's first affidavit fell short of the Fourth Amendment's particularity requirement. The Fourth Amendment to the U.S. Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or things to be seized.

---

*Yerkes*, 345 F.3d at 563, on appeal, *Brown*, 311 F.3d at 890, has become "must" at sentencing, *Plancarte-Vazquez*, 450 F.3d at 853.

Accordingly, *Plancarte-Vazquez* inaccurately characterized prior precedent. We therefore apply the more accurate prior panel statement of the law under the rule that precludes one panel of this court from overruling a prior panel's decision. *See Owsley v. Luebbers*, 281 F.3d 687, 690 (8th Cir. 2002) ("It is a cardinal rule in our circuit that one panel is bound by the decision of a prior panel."). Application of the prior panel rule to this case clarifies that, although proof of Gaines's control over at least one participant is sufficient to sustain a manager/supervisor enhancement on appeal, such proof is not *necessary*, either on appeal or at sentencing.

U.S. Const. amend. IV (emphasis added).

Dubose contends that Agent Somerville's affidavit failed to "particularly describ[e] the places to be searched, and the persons or things to be seized" because it omitted any reference to Dubose, whose telephone conversations were subsequently recorded. Dubose maintains that Agent Somerville's affidavit stated that Somerville had probable cause to believe that *only* Tyson, Gaines, and other named individuals were involved in the conspiracy under investigation, along with "others unknown." Dubose contends that this residual, catch-all clause referencing "others unknown" is too general to satisfy the Fourth Amendment and that the affidavit was unsupported by probable cause to entitle law enforcement to eavesdrop on Dubose's conversations.

"The District Court reviewed the suppression hearing transcript and made a *de novo* determination concerning those portions of the magistrate's findings and recommendations to which appellants objected." *United States v. Garcia*, 785 F.2d 214, 222 (8th Cir. 1986) (reviewing a wiretap application affidavit). Accordingly, "[t]hese determinations are findings of fact, which we must uphold unless clearly erroneous." *Id.* Still, our review of a district court's probable cause determination is actually a mixed question of law and fact. *United States v. Williams*, 616 F.3d 760, 764 (8th Cir. 2010) (quoting *United States v. Parish*, 606 F.3d 480, 486 (8th Cir. 2010)). Consequently, "[i]n reviewing a denial of a motion to suppress, we review the district court's factual determinations for clear error and its legal conclusions *de novo*." *Id.* (quoting *Parish* 606 F.3d at 486). Ultimately, "[t]he existence of probable cause is a mixed question of law and fact that we review *de novo*." *Id.* We hold that the district court did not err in concluding, as a matter of law, that Agent Somerville's affidavit stated sufficient particularity and probable cause under the Fourth Amendment.

Title III codifies its own particularity and probable-cause standards for wiretap applications and orders. Specifically, it requires wiretap applications to provide the

"identity of the person, if known, committing the offense and whose communications are to be intercepted," 18 U.S.C. § 2518(1)(b)(iv), and wiretap orders to "specify . . . the identity of the person, if known, whose communications are to be intercepted," *id.* § 2518(4)(a). We have long held that the "statutory probable cause standards set out in Title III *are co-extensive* with the constitutional requirements embodied in the fourth amendment." *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988) (emphasis added). But, to the extent Dubose reads that line of Eighth Circuit precedent as holding that the wiretap statute's *particularity* requirements are coextensive with the Fourth Amendment's, Dubose misreads our case law. Indeed, any assertion that Title III's particularity requirements are coextensive with the Fourth Amendment's contradicts the Supreme Court's clear statement that, "[i]n the wiretap context, [the Fourth Amendment's particularity] requirements are satisfied by identification of the telephone line to be tapped and the particular conversations to be seized." *United States v. Donovan*, 429 U.S. 413, 427 n.15 (1977).

Title III's particularity requirements must be distinguished from the Fourth Amendment's particularity requirements. *Id.* Dubose's case brings this distinction into sharp relief. Dubose does not allege that law enforcement's wiretap application violated Title III's particularity mandates, but, rather, the Fourth Amendment's.[5]

In *Berger v. New York*, the Supreme Court invalidated New York's eavesdropping law on Fourth Amendment particularity grounds because it authorized the *ex parte* issuance of wiretap and "bugging" warrants merely on the basis of a law enforcement official's affidavit swearing that he or she had a "'reasonable ground to believe that *evidence of crime* may be thus obtained.'" 388 U.S. 41, 54 (1967) (quoting N.Y. Crim. Proc. Law § 813-a) (emphasis added). In its decision, the Court noted that

---

[5]Indeed, because Dubose alleges only that the wiretap application and order violated the *Fourth Amendment's* particularity requirements, we do not consider whether the application and resulting order violated Title III's particularity requirements.

-11-

the New York law "la[id] down no requirement for particularity in the warrant as to what specific crime has been or is being committed, nor 'the place to be searched,' or 'the persons or things to be seized' as specifically required by the Fourth Amendment." *Id.* at 56. Finally, and critically important to the present analysis, the *Berger* Court conceded that "[i]t is true that the statute requires the naming of 'the person or persons whose communications, conversations or discussions are to be overheard or recorded'" but concluded that "this does no more than identify the person whose constitutionally protected area is to be invaded rather than 'particularly describing' the communications, conversations, or discussions to be seized." *Id.* at 59.

Thereafter, in *United States v. Kahn*, the Supreme Court concluded that "*Title III* requires the naming of a person in the application or interception order only when the law enforcement authorities have probable cause to believe that that individual is 'committing the offense' for which the wiretap is sought." 415 U.S. 143, 155 (1974) (emphasis added). In other words, the Supreme Court in *Kahn* decided, *on statutory grounds*, the very question that this court now considers on constitutional grounds. *See id.* at 150 ("The question presented is simply whether the conversations that the Government wishes to introduce into evidence at the respondents' trial are made inadmissible by the 'others as yet unknown language' of Judge Campbell's order or by the corresponding *statutory requirements of Title III*.") (emphasis added); *id.* at 160 (Douglas, J., dissenting) ("Whether the search would satisfy the Fourth Amendment is not before us, the decision below being based solely on the Act of Congress."). Indeed, the *Kahn* Court rejected the court of appeals's effort to equate a wiretap order containing the statutory, "as others yet unknown" language, with an unconstitutional "general" warrant, stating the following:

> The fallacy in the Court of Appeals' "general warrant" approach may be illustrated by examination of an analogous conventional search and seizure. If a warrant had been issued, upon a showing of probable cause, to search the Kahn residence for physical records of gambling operations [of Mr. Kahn's], there could be no question that a subsequent seizure of

-12-

such records bearing Minnie Kahn's [(Mr. Kahn's wife)] handwriting would be fully lawful, *despite the fact that she had not been identified in the warrant* or independently investigated. *In fact, as long as the property to be seized is described with sufficient specificity, even a warrant failing to name the owner of the premises at which a search is directed, while not the best practice, has been held to pass muster under the Fourth Amendment.*

*Id.* at 155 n.15 (emphasis added).

Finally, three years later, in *United States v. Donovan*, the Supreme Court considered, *inter alia*, "whether 18 U.S.C. § 2518(1)(b)(iv), which requires the Government to include in its wiretap applications 'the identity of the person, if known, committing the offense and whose communications are to be intercepted,' is satisfied when the Government identifies only the 'principal targets' of the intercept." 429 U.S. 413, 416 (1977). The Court ultimately construed § 2518(1)(b)(iv) to require that "a wiretap application . . . name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone." *Id.* at 428. In concluding that Title III entailed such sweeping identification requirements, the Court deduced from Title III's legislative history that "the requirements set forth in the various subdivisions of § 2518(1)(b), including the identification requirement at issue here, were intended to 'reflect . . . the constitutional command of particularization.'" *Id.* at 426–27 (quoting S. Rep. No. 1097, 90th Cong., 2d Sess., 66, at 101 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, at 2190)). Specifically, the Court observed that, "to the extent that Congress thought it was meeting the constitutional commands of particularization established in *Berger* and *Katz*, Congress may have read those cases as mandating a broad identification requirement." *Id.* at 427. Nevertheless, the Court explicitly clarified in *Donovan* what it implicitly stated in *Kahn*. *See supra* Section II-B. Specifically, the *Donovan* Court wrote that,

[a]t the time of the enactment of Title III, Congress did not have before it the view we expressed on this issue in *United States v. Kahn*, 415 U.S., at 155 n.15, 94 S.Ct. at 984. The Fourth Amendment requires specification of "the place to be searched, and the persons or things to be seized." *In the wiretap context, those requirements are satisfied by identification of the telephone line to be tapped and the particular conversations to be seized. It is not a constitutional requirement that all those likely to be overheard engaging in incriminating conversations be named.* Specification of this sort "identif(ies) the person whose constitutionally protected area is to be invaded rather than 'particularly describing' the communications, conversations, or discussions to be seized." *Berger v. New York*, 388 U.S., at 59, 87 S.Ct., at 1883.

*Id.* at 427 n.15 (emphasis added).

Thus, the Supreme Court does not treat the Fourth Amendment's *particularity* standards as "coextensive" with Title III's *particularity* standards.

Agent Somerville's affidavit and the district court's subsequent wiretap order did not run afoul of the Fourth Amendment for lack of particularity because the Fourth Amendment requires that a wiretap application (and subsequent wiretap order) identify only "the telephone line to be tapped and the particular conversations to be seized." *Id*. Here, as the district court recognized in its de novo review of the wiretap application proceedings, the record reflects that "[the judge authorizing the wiretap order] made a finding . . . 'that particular wire communications' as to certain named targets," i.e. Tyson and Gaines, "and others yet unknown," concerning the described drug trafficking offenses, would be intercepted. We uphold this factual finding unless it is clearly erroneous. *Garcia*, 785 F.2d at 222. "Under this standard, we ordinarily affirm a decision unless there is not substantial evidence to support it, it evolves from an erroneous view of the applicable law, or upon considering the entire record, we are left with a definite and firm conviction that a mistake has been made." *Ross*, 713 F.2d at 392. Moreover, "[c]ourts must test applications for wiretaps and eavesdropping in

-14-

a practical and commonsense fashion," and consequently we, as "[a] reviewing court[,] must accord broad discretion to the decision to authorize wiretapping or eavesdropping." *Garcia*, 785 F.2d at 221–22.

As the magistrate judge noted in his report and recommendation, "the application requested authorization to intercept calls to and from telephone number (612) 235-8604, with 'push-to-talk' number 183*810*4707, assigned to a Sprint Nextel Corporation cellular telephone further identified by International Mobile Subscriber Identification (IMSI) # 316010103756236." Moreover, according to the magistrate judge, "[t]he application generally assert[ed] the existence of probable cause as stated with particularity in an attached affidavit of FBI Special Agent James J. Somerville." Specifically, the district court concluded as a matter of law that "there was probable cause to find that such communications would concern drug trafficking." Based on the magistrate judge's factual findings concerning the contents of Agent Somerville's affidavit and the resulting wiretap order—findings that are not clearly erroneous—the district court did not err in concluding, as a matter of law, that the affidavit and order were sufficiently particular under the Fourth Amendment. Both the affidavit and the order identified the particular telephone line to be tapped and the particular conversations (i.e., those concerning drug trafficking) to be seized. That is all the particularity that the Fourth Amendment requires.

III. *Conclusion*

Based on the foregoing, we affirm.

_____