# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-1289

_____

United States of America

*Plaintiff - Appellee*

v.

Marcos Perez-Trevino

*Defendant - Appellant*

_____

No. 17-1352

_____

United States of America

*Plaintiff - Appellee*

v.

Juan Flores, also known as Alejandro Becerra

*Defendant - Appellant*

_____

No. 17-1718

_____

United States of America

*Plaintiff - Appellee*

v.

Daniela Castellanos

*Defendant - Appellant*

————————

Appeals from United States District Court
for the Northern District of Iowa - Waterloo

————————

Submitted: January 11, 2018
Filed: May 29, 2018

————————

Before COLLOTON, BENTON, and ERICKSON, Circuit Judges.

————————

ERICKSON, Circuit Judge.

Defendants/Appellants Marcos Perez-Trevino ("Perez-Trevino"); Juan Flores, a/k/a Alejandro Becerra ("Flores"); and Daniela Castellanos ("Castellanos") were tried together by a jury in the United States District Court for the Northern District of Iowa for their roles in a conspiracy to distribute methamphetamine. All three were found guilty and were sentenced by the court. After carefully considering the several issues raised by the appellants, we affirm the judgments of the district court.[1]

---

[1] The Honorable Linda R. Reade, then Chief Judge, United States District Court for the Northern District of Iowa, adopting reports and recommendations from the Honorable Jon Stuart Scoles, then United States Chief Magistrate Judge for the Northern District of Iowa, with respect to the motions to suppress.

## I.     BACKGROUND/PROCEDURE

In August 2015, eleven defendants, including the appellants, were charged in a conspiracy to deliver methamphetamine in and around Marshalltown, Iowa. Several of the defendants entered guilty pleas, but the appellants chose to proceed to a jury trial. During the six-day trial, some of the defendants' original co-conspirators cooperated with the government and testified, hoping for more favorable sentencing recommendations.

Prior to trial, Perez-Trevino moved to suppress evidence obtained during an August 12, 2015, traffic stop in Oklahoma. Perez-Trevino argued that the vehicle was improperly impounded and the inventory search was unlawful. The motion was heard by the chief magistrate judge, and Chouteau (Oklahoma) Police Officer Thomas Scott Fisher testified at the hearing. The chief magistrate issued a report and recommendation that the motion be denied. The judge overruled Perez-Trevino's objections, adopted the report and recommendation, and denied the motion.

Castellanos brought a pretrial motion to suppress evidence obtained from the interception of wire and electronic communications of a cell phone identified as Target Telephone #16, arguing that the application for the wiretap: (1) lacked sufficient specificity to establish probable cause, and (2) failed to sufficiently show the wiretap was necessary as required by 18 U.S.C. § 2518(3)(c). After argument on the motion without any additional evidence, the chief magistrate, finding the affidavit sufficient, issued a report and recommendation that the motion be denied. The judge overruled Castellanos's objections, adopted the report and recommendation, and denied the motion.

During the five-day trial, the government witnesses testified about information gleaned during the investigation including evidence obtained from intercepts of several telephones. The cooperating co-conspirators testified about their own

-3-

participation in the conspiracy and their knowledge of the participation of the three defendants. Following the procedures outlined in United States v. Bell, 573 F.2d 1040 (8th Cir. 1978), the trial court conditionally admitted hearsay evidence from alleged co-conspirators. Much of the testimony referenced Mario Murillo-Mora, a member of the conspiracy to distribute methamphetamine, who was connected by evidence to each of the defendants, as well as to other members of the conspiracy. The evidence revealed that the reason the government targeted various electronic devices, including telephone #16, was their connection to communications to and from Murillo-Mora related to the distribution of narcotics.

At the end of the government's case, the court entertained objections to the co-conspirator hearsay testimony. The court overruled the objections, finding that each of the admitted statements was made by a co-conspirator in the course of and in furtherance of the conspiracy. The court denied Perez-Trevino's request for a jury instruction on multiple conspiracies and an instruction regarding a mere buyer/seller relationship.

The jury found Perez-Trevino guilty of conspiracy to distribute 500 grams or more of a substance containing a detectable amount of methamphetamine, which contained more than 50 grams of pure methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Flores and Castellanos were found guilty of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. The district court sentenced Perez-Trevino to 292 months' imprisonment and sentenced Flores and Castellanos to 240 months' imprisonment.

## II. SUPPRESSION MOTIONS

"When reviewing the denial of a motion to suppress, we review a district court's factual findings for clear error and legal conclusions de novo." United States v. Evans, 781 F.3d 433, 436 (8th Cir. 2015) (citing United States v. Harris, 747 F.3d

1013, 1016 (8th Cir. 2014)). We "will affirm the district court's denial of a motion to suppress evidence unless it is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, based on the entire record, it is clear a mistake was made." United States v. Collins, 883 F.3d 1029, 1031 (8th Cir. 2018) (quoting United States v. Braden, 844 F.3d 794, 799 (8th Cir. 2016)). We may affirm on any ground supported by the record. United States v. Murillo-Salgado, 854 F.3d 407, 414 (8th Cir. 2017). For example, in United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003), we affirmed the denial of a motion to suppress based on the automobile exception to the warrant requirement rather than on the search-incident-to-arrest exception on which the district court relied.

## A. Perez-Trevino - Search of Automobile and Contents

On August 12, 2015, Officer Fisher noticed a 2000 Oldsmobile Intrigue with North Dakota license plates traveling north on Highway 69 in Oklahoma. He stopped the vehicle for a taillight violation. As he approached the vehicle, Officer Fisher observed two occupants in the car. Perez-Trevino presented an identification card to Officer Fisher but claimed to be licensed in Texas. Officer Fisher had separate conversations with Perez-Trevino and the passenger. The two gave conflicting stories as to their destination: Perez-Trevino indicating Iowa City and the passenger claiming Marshalltown. Officer Fisher ran Perez-Trevino's identifying information and determined that he did not have a valid license.[2] A license check for the passenger revealed that his license was suspended. Officer Fisher arrested Perez-Trevino for driving without a license. Having been instructed by the chief of police that stopped vehicles are not to be left abandoned on the roadside, Officer Fisher arranged to have the vehicle towed. Before the vehicle was towed, Officer Fisher

_____

[2]At trial, Officer Fisher testified that Perez-Trevino's driving license was suspended in North Dakota, but at the suppression hearing he indicated that Perez-Trevino was unlicensed.

prepared to do an inventory search of the vehicle in order to log any valuables. Officer Fisher testified:

> Any time we have arrested someone out of a vehicle or we have made contact with somebody where a vehicle – where we have become liable for it because of an action from us, we must impound that vehicle with the two wrecker services we have on rotation and then we have to conduct a thorough vehicle inventory.

When Officer Fisher leaned inside the vehicle to begin the inventory, he smelled raw marijuana "directly over the center console." He checked the contents of the center console because, according to his testimony, "[i]t's a common place, along with the glove box, for valuables or anything somebody is going to store in the vehicle." When he lifted the console, he discovered a plastic bag containing a green leafy substance, which was later determined to be marijuana. The inventory search further uncovered various food items and drinks. A one dollar bill containing a clear substance, later determined to be methamphetamine, was found under the passenger seat. Located in the back seat was a large cooler. Upon opening the cooler, Officer Fisher found more food and drinks and a Ziploc bag "containing a large amount of methamphetamine." It was later determined that the bag contained 877 grams of methamphetamine. A list of items found in the search was reported on a "CHOUTEAU POLICE DEPT. STORED VEHICLE REPORT" which indicated the vehicle was registered in North Dakota to Marcos and Maria Perez.

The Chouteau Police Department has a published policy for "Impoundment of Vehicles" that provides guidance for impounding and inventorying vehicles. Among the several stated reasons for impounding vehicles are safekeeping of evidence and "public assistance towing." The public assistance towing section specifically requires towing "[w]hen, following arrest of the owner/operator or for other reasons, the vehicle cannot be left at the scene without substantial risk of theft from or damage to

the vehicle or personal property contained therein." The policy's inventory procedure provides:

1.     It is the duty of all officers, who impound motor vehicles, to perform an inventory of those vehicles.
2.     The purpose of this inventory will be to ensure a proper accounting of all property in or attached to the vehicle in order to protect the officer from liability of assumed damages and/or missing property.
3.     The officer performing the inventory will conduct a thorough and uniform inventory of the vehicle and its compartments.

One of the regulations listed in the policy statement provides that "[o]fficers should take all necessary precautions when towing a vehicle to properly search and inventory a vehicle. An inventory search is intended to protect the citizen, the officer and the wrecker company from claims of loss and theft."

Citing Florida v. Wells, 495 U.S. 1 (1990), Perez-Trevino argues that the inventory search of the car violated the Fourth Amendment because the Chouteau Police Department policy did not provide sufficiently standardized criteria for searching closed containers inside the vehicle. "It is 'well-settled' law that 'a police officer, after lawfully taking custody of an automobile, may conduct a warrantless inventory search of the property to secure and protect vehicles and their contents within police custody.'" United States v. Williams, 777 F.3d 1013, 1015 (8th Cir. 2015) (quoting United States v. Rehkop, 96 F.3d 301, 305 (8th Cir. 1996)). The search "must comply with 'standardized police procedures.'" Id. at 1016 (quoting United States v. Mayfield, 161 F.3d 1143, 1145 (8th Cir. 1998)). "The police are not precluded from conducting inventory searches when they lawfully impound the vehicle of an individual that they also happen to suspect is involved in illegal activity." United States v. Pappas, 452 F.3d 767, 771 (8th Cir. 2006) (quoting United States v. Marshall, 986 F.2d 1171, 1175-76 (8th Cir. 1993)). We conclude that the

Chouteau Police Department towing policy contained sufficiently standardized police procedures for Officer Fisher to inventory the contents of the vehicle and its compartments.

We do not decide whether the Chouteau inventory policy provided Officer Fisher with authority to open the cooler. Instead, we affirm the denial of the motion to suppress because, at the time he opened the cooler, Officer Fisher had sufficient probable cause to search the vehicle and its contents under the "automobile exception" to the Fourth Amendment warrant requirement. Accord United States v. Winters, 221 F.3d 1039, 1042 (8th Cir. 2000) ("Trooper Busch then smelled raw marijuana. This created probable cause to search the car and its containers for drugs."). "Under the automobile exception, officers may search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." United States v. Davis, 569 F.3d 813, 817 (8th Cir. 2009) (quoting United States v. Cortez-Palomino, 438 F.3d 910, 913 (8th Cir. 2006) (per curiam). Prior to searching inside the cooler, Officer Fisher had obtained contradictory statements from the car's occupants as to their destination, discovered the plastic bag containing the marijuana, and found the dollar bill containing apparent drug residue. This was sufficient probable cause to search inside the cooler. Accord Davis, 569 F.3d at 817-18 ("If there had been any doubt about whether the smell of smoldering cannabis constituted probable cause to search the vehicle, such doubt was obviated by the discovery of a bag of marijuana in Davis's pocket.").

## B. Castellanos - Wiretap of Target Telephone #16

Daniela Castellanos argues that the district court erred in denying her motion to suppress evidence gained from the wiretap of Target Telephone #16. In 18 U.S.C. § 2518, Congress defined the procedure that must be followed for the "interception of wire, oral, or electronic communications." 18 U.S.C. § 2518(10)(a) provides:

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that –
(i) the communication was unlawfully intercepted;
(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
(iii) the interception was not made in conformity with the order of authorization or approval.

"The remedies and sanctions described in [chapter 18] with respect to the interception of electronic communications are the only judicial remedies and sanctions for nonconstitutional violations of this chapter involving such communications." 18 U.S.C. § 2518(10)(c). An "aggrieved person" is defined at 18 U.S.C. § 2510(11) as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." In paragraph No. 2 of her motion to suppress the wiretap evidence, Castellanos alleges: "During the period of time the wiretap authorization was in place, the government contends that Ms. Castellanos was heard on or a party in some of the phone calls and text messages involving target telephone 16."

Castellanos contends that her motion should have been granted because the affidavit attached to the warrant application did not contain sufficient facts to support a finding of probable cause or of necessity as required by 18 U.S.C. § 2518(3)(a-c). We address each asserted error separately, United States v. Thompson, 690 F.3d 977, 984-87 (8th Cir. 2012), and hold that the district court did not err in denying the motion to suppress.

## 1. *Probable Cause*

Section 2518 requires a two-step probable cause analysis. First, there must be probable cause that an individual has committed, is committing, or is about to commit a crime listed in 18 U.S.C. § 2516. 18 U.S.C. § 2518(3)(a). Second, the application must show probable cause that "particular communications" relating to the specific offense will be obtained from the interception of the communication. 18 U.S.C. § 2518(3)(b). "We have long held" that the probable cause standards in section 2518 "*are co-extensive* with the constitutional requirements" of the Fourth Amendment. United States v. Gaines, 639 F.3d 423, 430 (8th Cir. 2011) (quoting United States v. Leisure, 844 F.2d 1347, 1354 (8th Cir. 1988)). This guides us in our review of the district court's probable cause analysis. We also recognize, however, that the particularity requirements of section 2518(3)(b) are defined by the statute. Id. at 431-32 (citing United States v. Donovan, 429 U.S. 413, 416, 428 (1977)). The first step is not disputed as § 2516(1)(e) lists any offense involving "the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs, punishable under any law of the United States."

Our analysis focuses on the second step. The application for the wiretap warrant identified Target Telephone #16 as subscribed to Geoffrey Forney of Des Moines, Iowa, and used by Mario Murillo-Mora. The application sought authorization for intercepting "wire and electronic communications" of several named individuals, including Murillo-Mora, and several unknown males and females who had been communicating with Murillo-Mora and other co-conspirators on prior authorized electronic communication interceptions. Castellanos was not one of the individuals identified in the application. An application for authorizing a wiretap must identify "the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. § 2518(1)(b)(iv). The Supreme Court has interpreted the statute as not requiring the government "to identify an

-10-

individual in the application unless it has probable cause to believe (i) that the individual is engaged in the criminal activity under investigation and (ii) that the individual's conversations will be intercepted over the target telephone." United States v. Donovan, 429 U.S. 413, 423 (1977) (citing United States v. Kahn, 415 U.S. 143 (1974)). A wiretap application must, however, "name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone." Id. at 428. A district court's grant of an application for a wiretap is appropriate if it is the result of a "practical, common-sense decision" that "considering the 'totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Thompson, 690 F.3d at 984-85 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). "In determining probable cause we are bound to consider only the facts contained within the four corners of the affidavit." United States v. Milton, 153 F.3d 891, 894 (8th Cir. 1998) (citing United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995)).

The application for the wiretap authorization order specifically names more than twenty individuals, in addition to several yet unidentified target subjects suspected in the conspiracy to distribute narcotics, based on investigations from prior court-authorized wiretaps. The government sufficiently identified all of the individuals it had probable cause to believe were involved in criminal activity.

The application informed the court of the type of evidence law enforcement expected to recover from the targeted telephone. It states:

> In particular, these wire and electronic communications are expected to include conversations of an evidentiary nature revealing:
> 1) The details of carrying out the above-named offenses;

2)    The identity of individuals as yet unknown who are involved in these offenses and the extent of their involvement;

3)    The times and places where illegal transactions will occur;

4)    The amounts, prices, etc., of illegal narcotics/controlled substances which have been and are being possessed and distributed by these individuals;

5)    The identity of the source of these illegal drugs and the extent of the source's involvement;

6)    The manner in which money derived from the sale of illegal narcotics/controlled substances is utilized, concealed and dispensed;

7)    The arrangement and verification of meetings between individuals involved in the above-named offenses;

8)    The nature and scope of the continuing conspiracy; and

9)    The role of each person participating in the conspiracy.

Attached to the application is an affidavit of Bryan J. Furman, a Task Force Officer with the Drug Enforcement Administration ("DEA") in Cedar Rapids, Iowa. At the time he prepared the affidavit, Officer Furman had over twenty years experience in law enforcement and had been with the DEA for over five years. His experience provided him with knowledge of the language and terminology used by illegal narcotics dealers to disguise their illegal activity. The affidavit informs the court of the facts which led the investigators to Target Telephone #16. For example, Murillo-Mora was known to be operating mostly out of the Marshalltown, Iowa, area and was using multiple telephones to communicate with co-conspirators to facilitate the drug trafficking. Murillo-Mora was identified as using Target Telephone #16 to conduct business with other known co-conspirators using targeted telephones already subject to court-authorized wiretaps. Transcripts of specific conversations involving the facilitation of narcotics deliveries are included in the affidavit.

The affidavit contains more than twenty-five pages, including nineteen separate paragraphs, detailing information known to the Task Force that supported the

-12-

application to intercept communications from Target Telephone #16. Castellanos contends that because Furman repeatedly used the phrase "I believe" to introduce his factual references, the statements are not facts that the magistrate can rely on but are instead mere beliefs, hunches, and speculative opinions. Such hyper-technical parsing of phrasing is inconsistent with the evidence and common sense. While it might have been more appropriate for Officer Furman to have written "it is my opinion, based on my experience in law enforcement and narcotics investigations," rather than "I believe," his choice of words did not negate the factual information he related to the court in the affidavit.

Based on all of the circumstances, we conclude that the district court's grant of authority to intercept communications to and from Target Telephone #16 was the result of a "practical, common-sense decision" that there was a "fair probability that contraband or evidence" of criminal activity would be found. E.g., Thompson, 690 F.3d at 984-85. The application and affidavit contained sufficient facts to establish probable cause.

### 2. Necessity

In addition to finding probable cause, in order to issue a warrant for a wiretap, the court must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). "This necessity requirement prevents the government from routinely using wiretaps 'as the initial step in an investigation.'" United States v. Colbert, 828 F.3d 718, 725 (8th Cir. 2016) (quoting United States v. Thompson, 210 F.3d 855, 858-59 (8th Cir. 2000)). "But as we have repeatedly held, the necessity requirement does not mandate that the government 'exhaust all possible techniques before applying for a wiretap.'" Id. (quoting United States v. Macklin, 902 F.2d 1320, 1326-27 (8th Cir. 1990)). "The government is simply not required to use a wiretap only as a last resort." Macklin, 902 F.2d at 1327 (citing United States v. Matya, 541

-13-

F.2d 741, 745 (8th Cir. 1976)). The issuing judge determines "in a commonsense manner" whether the necessity requirement is met. Id. (citations omitted). We may reverse this determination of fact only if it is clearly erroneous. Thompson, 690 F.3d at 986 (quoting Macklin, 902 F.2d at 1327)).

This is not a case in which the government decided to use a wiretap at the beginning of its investigation of criminal activity. Officer Furman's affidavit contains sixty-eight paragraphs providing details of various investigative techniques used prior to requesting the wiretap of Target Telephone #16. Investigators utilized prior wiretaps, confidential sources, controlled purchases, physical surveillance, undercover agents, search warrants, interviews, and trash searches, among other strategies. Investigators interviewed suspects and utilized grand jury subpoenas to the extent possible. The affidavit adequately explains the limited success of specific investigative techniques, the likely lack of success of certain strategies, and the possible dangers related to particular investigative tactics. The affidavit indicates that the application was based on the conclusion that "[t]he only reasonable method of developing the necessary evidence of violations is to intercept telephonic and electronic communications as requested."

Officer Furman's affidavit contains sufficient facts to support a finding that the necessity requirement of § 2518(3)(c) was met. The district court determination on this issue is not clearly erroneous.

III.   **PEREZ-TREVINO'S MOTION FOR JUDGMENT OF ACQUITTAL**

We review *de novo* a denial of a motion for judgment of acquittal, "evaluating the evidence in the light most favorable to the verdict and drawing all reasonable inferences in its favor." United States v. Almeida-Olivas, 865 F.3d 1060, 1062 (8th Cir. 2017) (quoting United States v. Wright, 739 F.3d 1160, 1167 (8th Cir. 2014)). The conviction will not be disturbed unless "no reasonable jury could have found the

-14-

defendant guilty beyond a reasonable doubt." Id. (quoting United States v. Serrano-Lopez, 366 F.3d 628, 634 (8th Cir. 2004)).  To prove a conspiracy, "the government need not prove a formal agreement existed, but rather 'a tacit understanding' between the parties."  United States v. Parker, 871 F.3d 590, 600-01 (8th Cir. 2017) (quoting United States v. May, 476 F.3d 638, 641 (8th Cir. 2007)).  "We will not reverse the verdict if the evidence is sufficient for a jury to find beyond a reasonable doubt that the defendant participated in the conspiracy."  Id.

"To convict [Perez-Trevino] for conspiracy to distribute more than 500 grams of a mixture and substance containing methamphetamine, 'the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the [methamphetamine]; (2) that [Perez-Trevino] knew of the conspiracy; and (3) that [he] intentionally joined the conspiracy.'" Almeida-Olivas, 865 F.3d at 1062 (quoting United States v. Sanchez, 789 F.3d 827, 834 (8th Cir. 2015) (second alteration in original)).  Perez-Trevino argues that there was insufficient evidence for a jury to find proof beyond a reasonable doubt that he knew of the conspiracy or intentionally joined it.  He cites United States v. Carper, 942 F.2d 1298 (8th Cir. 1991), and United States v. Cox, 942 F.2d 1282 (8th Cir. 1991), to support his argument for acquittal. In Cox, we reiterated that "[a] conspiracy conviction requires a showing that the alleged individuals joined together to further an agreed-to criminal purpose: here, distribution of cocaine."  942 F.2d at 1285 (citations omitted).  Because the government's evidence failed to "explain why various unnamed individuals accompanied Cox," we reversed his conspiracy conviction.  Id. at 1285-86.  We specifically explained: "Without some evidence that the accompanying individuals agreed to take cocaine for distributive purposes, we do not see how a rational trier of fact could find beyond a reasonable doubt that a conspiracy existed for that purpose." Id. at 1286.  In Carper, we reversed Juliette Stark's conviction because the evidence never identified her unnamed source for methamphetamine.  942 F.2d at 1302.  We noted that, without speculating that Carper was her source, the evidence tended "to

-15-

prove Juliette Stark is guilty of a crime, but not conspiracy with Carper to distribute methamphetamine." Id.

As the trial court summarized in its order denying the motion for acquittal, substantial evidence supported the finding that a conspiracy to distribute methamphetamine existed, Perez-Trevino knew of the conspiracy, and he intentionally participated in the conspiracy. Witnesses, who included six co-conspirators, confirmed the existence of a dynamic conspiracy, in which several individuals participated. Perez-Trevino, along with Murillo-Mora and Flores, participated as higher-level suppliers of methamphetamine, supplying some of the same customers. Perez-Trevino was caught several times with substantial amounts of methamphetamine in his possession. Perez-Trevino resided with other co-conspirators, exchanged multiple telephone calls with co-conspirators, including Murillo-Mora and Jessica Ceniceros, and purchased a vehicle from one of the co-conspirators. Perez-Trevino used Ceniceros's garage to store two pounds of methamphetamine. In exchange, Ceniceros kept a quarter of a pound to sell for herself. Vania Guadarrama, a member of the conspiracy who testified at trial, purchased methamphetamine from a source known as El Bote, who also supplied methamphetamine to Perez-Trevino. Guadarrama testified that she purchased methamphetamine from Perez-Trevino. There was also evidence that Perez-Trevino "fronted" methamphetamine to Guadarrama and later went to her residence to collect an undischarged debt.

Substantial evidence supports the jury verdict. Cox and Carper are clearly distinguishable. The record contains evidence that Perez-Trevino had direct and substantial contact with several known, identified conspirators. Further, the evidence shows that these contacts were for the purpose of facilitating the distribution of methamphetamine in and around Marshalltown, Iowa. Accord United States v. Garcia, 569 F.3d 885, 889 (8th Cir. 2009) ("A reasonable jury evaluating this evidence could find that [defendant] was an actual participant in the

methamphetamine-distribution conspiracy."). The district court correctly denied the motion for judgment of acquittal.

## VI. PEREZ-TREVINO'S PROPOSED MULTIPLE CONSPIRACY INSTRUCTION

"The 'issue of whether the defense produced sufficient evidence to sustain a particular instruction, such as a multiple conspiracy instruction, is generally a question of law subject to de novo review.'" United State v. Maza, 93 F. 3d 1390, 1398 (8th Cir. 1996) (quoting United States v. Jackson, 67 F.3d 1359, 1367 (8th Cir. 1995)); see also United States v. Hull, 419 F.3d 762, 769 (8th Cir. 2005). When the evidence supports the existence of a single conspiracy, a court does not err in denying a request for a multiple conspiracy instruction. In United States v. Delgado, 653 F.3d 729, 735-36 (8th Cir. 2011) (citations omitted) (internal quotation marks omitted), we summarized:

> A single conspiracy is composed of individuals sharing common purposes or objectives under one general agreement. In evaluating whether a variance occurred, we look to the totality of the circumstances and give the verdict the benefit of all reasonable inferences that can be drawn from the evidence. A variance based on multiple conspiracies justifies reversal only if a "spillover" of evidence from one conspiracy to another prejudices the defendant's substantial rights.

A single conspiracy is not converted to multiple conspiracies simply because different defendants enter a conspiracy at different times or perform different functions. Maza, 93 F.3d at 1398 (citing United States v. Baker, 855 F.2d 1353, 1357 (8th Cir. 1988). Nor does "the fact that different individual defendants contributed a portion of the total drugs to suppliers or participated in numerous separate transactions . . . convert a single conspiracy to multiple conspiracies." Id. at 1398-99 (citing United States v. Spector, 793 F.2d 932, 935 (8th Cir. 1986). A single conspiracy can be proven even

though the participants and their activities change over time.  United States v. Slagg, 651 F.3d 832, 840 (8th Cir. 2011).  This is true even if some participants are unknown to other conspirators or uninvolved in some transactions.  United States v. Longs, 613 F.3d 1174, 1176 (8th Cir. 2010). Drug dealers who sometimes compete with one another may in fact be members of the same conspiracy.  Slagg, 651 F.3d at 842; Delgado, 653 F.3d at 736 (citing United States v. Jeffers, 570 F.3d 557, 568 (4th Cir. 2009)).

As indicated above, the evidence at trial easily supports a finding that Perez-Trevino knowingly participated in the single conspiracy alleged at trial.  The trial court did not err in denying the motion for a jury instruction on multiple conspiracies.[3]

## V.    DEFENDANTS' OBJECTIONS TO THE ADMISSION OF TESTIMONY

"We review the district court's admission of evidence for an abuse of discretion, affording 'deference to the district judge who saw and heard the evidence.'"  United States v. Melton, 870 F.3d 830, 837 (8th Cir. 2017) (quoting United States v. Two Elk, 536 F.3d 890, 900 (8th Cir. 2008)).  "An evidentiary ruling is harmless if the substantial rights of the defendant were unaffected, and the error had no, or only a slight, influence on the verdict."  Id. (quoting United States v. Worman, 622 F.3d 969, 976 (8th Cir. 2010)).  We will affirm the district court's decision unless we find an abuse of discretion that is both clear and prejudicial.  E.g., United States v. Womack, 191 F.3d 879, 883 (8th Cir. 1999).

---

[3]There is no indication that Perez-Trevino was inhibited from arguing his lack of knowledge of, or participation in, the conspiracy as it was alleged at trial.  A trial court does not err in denying a proposed instruction when the instructions as a whole adequately advise the jury of the law and permit the parties to argue appropriately to the jury.  See United States v. Thunder, 745 F.3d 870, 874 (8th Cir. 2014) (citing United States v. Christy, 647 F.3d 768, 770 (8th Cir. 2011)).

## A. Flores/Castellanos - Hearsay Co-conspirators

To admit "statements of co-conspirators against a defendant 'the government must prove by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the declaration was made during the course of and in furtherance of the conspiracy.'" Womack, 191 F.3d at 883 (quoting United States v. Guerra, 113 F.3d 809, 813 (8th Cir. 1997)); Fed. R. Evid. 801(d)(2)(E). In Bell, we provided guidance to district courts for ruling on objections to the admission of out-of-court statements of co-conspirators. We outlined a procedure that included conditionally admitting the evidence and then ruling on the objections at the close of the government's case. 573 F.2d at 1044. The procedural steps are made outside of the jury's presence, and the court makes its admissibility ruling on the record before submitting the case to the jury. Id.

The trial court properly followed the Bell procedure, conditionally admitting the statements and then taking up the objections at the close of evidence. The hearsay evidence objected to included the following:

1) Exhibits 32, 40, and 42 contained phone records from Jessica Ceniceros's phone. The evidence was introduced through Officer Furman. Ceniceros later testified, confirming the information supplied by the officer.

2) Exhibit 50 contained English translations of conversations between Castellanos and Murillo-Mora in which they discussed Castellanos's role in wiring money, collecting money, and obtaining narcotics.

3) Two statements by witness Rachel Berrones in which she testified to statements by Murillo-Mora were at issue. In the first statement, Berrones testified that Murillo-Mora said he was upset with Castellanos because he had given Castellanos money to wire to Mexico and she told him the money was stolen. He expressed to Berrones his view that

-19-

Castellanos lied and spent the money. The second statement concerned what Murillo-Mora said regarding Flores's involvement in the organization. The testimony indicated Flores was Murillo-Mora's driver until they ended their friendship because they were not agreeing on business and Murillo-Mora wanted to go his separate way.

The trial court overruled all of the objections, concluding that a preponderance of the evidence supported a finding that a conspiracy existed, the statements were made by conspirators, and the statements provided information furthering the conspiracy. We hold that the district court did not abuse its discretion by admitting the evidence under rule 801(d)(2)(E). Accord United States v. Camacho, 555 F.3d 695, 703 (8th Cir. 2009) (recognizing that the "district court made the appropriate *Bell* inquiry and we cannot say that its findings are erroneous" and holding that the district court's ruling was not an abuse of discretion).

## B. Flores - Letters

During cross-examination of co-conspirator, Frances Gasca, Flores's attorney asked about two letters Gasca sent to Flores while she was in pretrial detention. The government was unaware of the correspondence between Gasca and Flores before the questioning began. While answering the questions regarding her letters to Flores, Gasca attempted to explain that she was responding to communications she had received from Flores. Her explanation was truncated by defense counsel. On redirect, the government's counsel asked Gasca to explain what she wanted to explain during cross-examination. Gasca began, "I wrote that because he wrote a letter to Daniela Castellanos saying for me to tell everybody that . . .," at which time Flores's counsel interrupted with an objection for lack of foundation. The court, apparently sensing a failure in the foundation, directed the government to "break that down a little bit so that we don't have an objection." The following redirect ensued:

-20-

Q. You were housed with Ms. Castellanos at some point in time?
A. Yes.
Q. And during that time did she show you letters from Juan Flores?
A. Yes.
Q. And did you read those letters?
A. Yes.
Q. And what did he write to Ms. Castellanos in those letters?
A. To say that –
   MR. BELL: Objection, foundation as to who wrote the letter.
   THE COURT: Objection overruled. You may answer.
A. To say that – to tell them that I was – he was only taking me to D to have sex with and that he was just my ride and that there was no involvement of meth.
Q. So Mr. Flores wrote Ms. Castellanos a letter trying to tell you what to say in court today?
A. That was a while ago, but, yes.

Gasca then testified that she saw that letter with her own eyes. During recross-examination, Flores's attorney elicited the following testimony:

Q. Now, as I understand your response to Ms. Williams's questions about writing this letter to Juan, you indicated that you did not receive any letter from Juan; it was somebody else who allegedly received it?
A. Yes.
Q. And when you – has Juan ever written to you other than – has Juan ever written a letter to you?
A. He sent me a card.
Q. When?
A. I don't remember, but it was maybe February.
Q. And what did he – did he handwrite anything on it or did he just sign it?
A. He wrote – I can't recall exactly what he wrote, but he signed it as well.
   *     *     *

Q. Okay. And how many times did you see this letter that is alleged to have been sent by Juan to Ms. Castellanos?

A. Like once or twice.

\* \* \*

Q. And when you saw this letter in the jail, that was in the Linn County Jail?

A. Yes.

Q. When you saw it, was the envelope already open?

A. Yes.

Q. Okay. Were you present when the envelope was opened?

A. Was I? No.

Q. Since you had never seen anything that Juan had written before, I'm assuming you couldn't identify whether that was his writing or not in that letter, correct.

A. Correct.

Q. And you have no idea if that was what was in the letter – in the envelope when it came or whether somebody replaced it with something else?

A. Well, I saw letters prior to that that he wrote that had the same writing.

Q. From who?

A. Daniela, from Juan.

Q. But you never independently obtained his writing to verify?

A. No.

Q. And you're certainly not a handwriting expert?

A. What?

Q. You're certainly not a handwriting expert?

A. No.

By the time Flores was done with his recross-examination of Gasca, he had elicited the necessary foundation. The testimony informed the jury that Gasca was not a handwriting expert and provided a basis for Gasca's lay belief that the letters were from Flores. The jury then had the information it needed to appropriately weigh the testimony. Even if the admission of the testimony were the result of an abuse of discretion, the error would be harmless considering the mass of evidence supporting

Flores's conviction and the lack of any indication that Flores's substantial rights were prejudiced. E.g., Melton, 870 F.3d at 837.

## VI.   SENTENCING

In reviewing a district court's sentence we "first ensure that the district court committed no significant procedural error." United States v. Salazar-Aleman, 741 F.3d 878, 880 (8th Cir. 2013) (quoting United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc)). "We then consider whether the sentence is substantively reasonable." Id. "Regardless of whether the final sentence is inside or outside the Guidelines range, we review a defendant's sentence under a deferential abuse-of-discretion standard." United States v. Boykin, 850 F.3d 985, 988 (8th Cir. 2017) (citing United States v. Goodale, 738 F.3d 917, 924 (8th Cir. 2013)).

### A. Flores

Flores argues that his sentence is substantially unreasonable because the court attributed improper amounts of methamphetamine to him, denied his motion for downward departure, and failed to properly consider his history and character. At sentencing, the court informed the parties that it considered every factor under 18 U.S.C. § 3553(a). Based on the evidence at trial, the court calculated that Flores "should be held accountable for 2,265.9 grams of ice methamphetamine, resulting in a score of 36." The court then found obstruction of justice because Flores tried to influence the testimony of a witness and he used a false name and birth certificate in an attempt to confuse law enforcement. This resulted in a two-point upward adjustment to level 38. Flores had a criminal history of I. The Guideline range for the offense was 235 to 293 months. The court sentenced Flores to the statutory maximum of 240 months, a sentence near the low end of the Guideline range. In explaining the sentence the court noted Flores's substantial criminal behavior even while under court supervision and his high risk to recidivate.

-23-

The sentence is within the correctly-calculated Guideline range. Nothing in the record supports a finding that the sentence is substantially unreasonable. The court did not abuse its discretion in sentencing Flores to 240 months' incarceration.

**B. Castellanos**

Castellanos challenges her 240-month sentence on three grounds. She first asserts that the court attributed too much methamphetamine to her. She also contends that the court miscalculated her criminal history score. Finally, she argues that the court erred by failing to decrease her offense level by two points, pursuant to U.S.S.G. § 3B1.2, as a minor participant.

At sentencing the district court heard arguments regarding the evidence relating to the amount of methamphetamine attributable to Castellanos, including evidence that Castellanos had delivered five pounds of methamphetamine on one occasion. The record supports the court's conclusion that Castellanos be held accountable for over 4.5 kilograms of methamphetamine ("ice"), specifically 4,819.5 grams, putting the base offense level at 38. The record supports the court's decision that Castellanos did not meet her burden of proof for the two-level reduction for minor role in a conspiracy. The court further noted that the calculation of 240 months would be the same even with the reduction. The statutory maximum of 240 months is well below the Guideline range of 292 to 365 months. Nothing in the record supports a conclusion that the sentence is substantially unreasonable. The court did not abuse its discretion in sentencing Castellanos to 240 months' incarceration.

**VII. CONCLUSION**

We affirm the judgments of the district court.

_____

-24-